UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER LEANN PARKER,                          Case No. 15-12558

                    Plaintiff,               George Caram Steeh
v.                                           United States District Judge

CAROLYN W. COLVIN,                           Stephanie Dawkins Davis
                                             United States Magistrate Judge
                    Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 14, 17)**

## I.  PROCEDURAL HISTORY

A.    Proceedings in this Court

On July 20, 2015, plaintiff filed the instant suit seeking judicial review of
the Commissioner's decision disallowing benefits.  (Dkt. 1).  Pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), District Judge George Caram
Steeh referred this matter to the undersigned for the purpose of reviewing the
Commissioner's decision denying plaintiff's claims.  (Dkt. 3).  This matter is
before the Court on cross-motions for summary judgment.  (Dkt. 14, 17).  Plaintiff
also filed a reply in support of her motion for summary judgment.  (Dkt. 19).  The
cross-motions are now ready for report and recommendation.

B.    Administrative Proceedings

On May 31, 2012, plaintiff filed claims for child's insurance benefits and supplemental security income.  (Dkt. 11-2, Pg ID 52).  In both applications, plaintiff alleged a disability beginning December 1, 2010.  The Commissioner initially denied plaintiff's disability applications on August 8, 2012.  *Id*. Thereafter, plaintiff requested an administrative hearing, and on December 3, 2013, she appeared with counsel before Administrative Law Judge ("ALJ") Richard L. Sasena, who considered her case *de novo*.  (Dkt. 11-2, Pg ID 66-87). In a March 27, 2014 decision, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act.  *Id*. at Pg ID 49-61.  The ALJ's decision became the final decision of the Commissioner on May 26, 2015, when the Social Security Administration's Appeals Council denied plaintiff's request for review.  *Id*. at Pg ID 33-38.

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that defendant's motion for summary judgment be **DENIED**, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be **REVERSED AND REMANDED** for proceedings consistent with this Report and Recommendation.

## II.    FACTUAL BACKGROUND

### A.    ALJ's Findings

Plaintiff was 18 years old on the alleged onset date and 20 years old at the

time of the hearing.  (Dkt. 11-2, Pg ID 70-71).  Plaintiff was diagnosed with

multiple sclerosis in 2009.  *Id*. at Pg ID 70.  The ALJ applied the five-step

disability analysis to plaintiff's claims and found at step one that between the

alleged onset date and the date of the decision, plaintiff did not engage in any

substantial gainful activity.  *Id*. at Pg ID 54.  At step two, the ALJ found that

plaintiff had the following severe impairment: multiple sclerosis.  *Id*. at Pg ID 54-

55.  At step three, the ALJ found that plaintiff did not have an impairment or

combination of impairments that met or equaled one of the listings in the

regulations.  (*Id*. at 14).  The ALJ determined the following as to plaintiff's

residual functional capacity (RFC):

> After careful consideration of the entire record, the
> undersigned finds that the claimant has the residual
> functional capacity to perform sedentary work as defined
> in 20 CFR 404.1567(a) and 416.967(a), with the
> following limitations: the claimant can stand and/or walk
> for no more than two hours of an eight-hour workday.
> She can sit for six hours of an eight-hour workday. She
> must be able to alternate sitting and standing at least
> every sixty minutes. The claimant can lift no more than
> five pounds frequently and ten pounds occasionally. The
> claimant can occasionally climb, balance, stoop, kneel,
> crouch, and crawl. She should avoid concentrated
> exposure to extreme heat and cold.

*Id.* at Pg ID 55.  At step four, the ALJ determined that plaintiff did not have any

past relevant work.  *Id*. at Pg ID 59.  At step five, the ALJ concluded that based on

plaintiff's age, education, work experience and RFC, there were jobs that existed

in significant numbers in the national economy that plaintiff could have performed and, therefore, she was not under a disability at any time from the alleged onset date through the date last insured. *Id*. at Pg ID 60.

  B.  <u>Plaintiff's Claims of Error</u>

  Plaintiff first claims that the ALJ's credibility findings are not supported by substantial evidence. Plaintiff testified to and complained of severe fatigue, poor balance, weakness, urinary frequency and incontinence, blurry vision and double vision that affects her ability to do her activities of daily living; caused her to drop out of college twice; and causes her to go to the bathroom 8-10 times a day with three accidents in the last month leading up to her hearing. (Dkt. 11-2, Pg ID 71-77, 79-80). According to plaintiff, the ALJ's credibility finding is not supported by substantial evidence. Plaintiff points to significant objective evidence of the progression of her relapsing, remitting MS. The record documents the progress of the disease process as shown by the multiple MRI's from 2009 to her September 17, 2013 MRI documenting significant increasing brain lesions plus thoracic spinal lesions. (Dkt. 11-7, Pg ID 283-286, 301). Plaintiff also has bilateral optic neuropathy as confirmed by optical coherence tomography. *Id*. at Pg ID 302. Her treating neurologist, Dr. Rossman, has diagnosed MS, Ataxia, Optic Neuritis. *Id*. at Pg ID 313.

  Plaintiff contends that the ALJ's focus on the need for consistent abnormal

neurological findings was misplaced, given that the Commissioner has specifically recognized that MS is a condition which is "episodic in character." 20 C.F.R. Pt. 404, Supbt. P, App. 1, Listing 11.00(E). Morever, with relapsing, remitting MS, "neurological deficits develop and then improve either completely or partially. In patients who achieve only partial restoration of neurological function, secondary progression of the disease may result in a gradual accumulation of visual, motor, or sensory disabilities. *See* Taber's Cyclopedic Medical Dictionary at 1398. Plaintiff asserts that the ALJ failed to consider that the very nature of plaintiff's relapsing and remitting MS is that there are periods of increased and decreased symptoms. Indeed, it is recognized that "[b]ecause sensory symptoms may occur in the absence of clinical signs the neurological examination may be normal or near normal even when seen during relapse." (Dkt. 11-6, Pg ID 272). For example, plaintiff points out that Dr. Rossman diagnosed Ataxia based on her history of balance and gait issues, even though her gait was normal when seen in September 2013. (Dkt. 11-7, Pg ID 309-313). Thus, plaintiff maintains that the ALJ erroneously relied on the fact that some neurological examinations were normal as a basis to reject plaintiff's testimony.

Plaintiff also points out that the record contains abnormal neurological findings which support her complaints, including an increase in the time it took her to walk 25 feet from 4.97 seconds in March 2009 to 12.47 seconds in June

2010, a two and a half fold increase.  (Dkt. 11-7, Pg ID 291, 298).  Abnormal

findings on examinations included bilateral Hollmann response, "globally brisk at

3/4 in biceps, triceps, brachioradialis and pattellar, mild difficulty with tandem

gait, "slight nystagmus and gaze to the left," deep tendon reflects at 2/4,

questionable vertical nystagmus," antalgic gait, and decreased sensation from toe

to groin.  (Dkt. 11-7, Pg ID 285, 289, 300, 312, 315).

      Plaintiff also maintains that the ALJ erred in discounting her credibility

based on her missed appointments and medication dosages.  According to

plaintiff, it appears that the record is missing some treatment notes as she testified

that she sees Dr. Rossman every three to six months and last saw him in May

2013, a treatment note which is not in the record.  The record also documents that

plaintiff has had insurance issues with obtaining approval of a very expensive

medication, Rebif.  (Dkt. 11-7, Pg ID 283, 289).  Plaintiff points to Social Security

Ruling 96-7 which provides that there may be good reasons for irregular medical

visits and treatment, including inability to afford treatment.  SSR 96-7p, 1996 WL

374186 (S.S.A. 1996).  Yet, according to plaintiff, the ALJ never inquired of these

matters.  More importantly, MS is not curable and plaintiff says that there can be

no denying that the objective evidence documents a worsening of her MS in

September 2013, when she acknowledged medication compliance issues, which

supports her subjective complaints.  (Dkt. 11-7, Pg ID 313).  A brain MRI dated

September 17, 2013, revealed "numerous T2-hyperintense signal abnormalities" consistent with multiple demyelinating plaques, with several new or larger lesions compared to the prior study, "specifically a lesion in the left frontal area and two or three lesions adjacent to posterior body and trigone of right lateral ventricle." (Dkt. 11-7, Pg ID 301). Also, optical tomography results dated September 23, 2013, were consistent with bilateral optic neuropathy. (Dkt. 11-7, Pg ID 302-306).

Plaintiff also asserts that the ALJ failed to take into account her medication side effects. She says while the treatment records may not confirm her complaints of flu-like symptoms from the Rebif, the medical literature certainly confirms that this is a common side effect of this drug. Several circuits, including the Sixth Circuit, have relied on the Physician's Desk Reference as a basis to find that the ALJ failed to properly evaluate a claimant's complaints of medication side effects. In *Felisky v. Bowen*, 35 F.3d 1027, 1040 (6th Cir. 1994), the Sixth Circuit specifically referenced the PDR as authority for the side effects of Darvocet-100 and Tylenol 4, in part, in holding that the ALJ failed to discuss the factors contained in 20 C.F.R. § 404.1529(c)(2) and how they relate to the evidence in discussing the claimant's subjective complaints.

Finally, plaintiff contends that the ALJ's finding that her "claims of having to drop her classes because of her symptoms are somewhat questionable" is based

on mere speculation and cannot be sustained.  In fact, the evidence supports her

testimony. She testified that after graduating from high school in 2011, she "tried

doing community college" part-time during the fall term, but had to drop out due

to family stress, but she tried to go again to take three classes, twice a week,

"maybe a month ago," but had to "drop those classes" as well because "they found

more lesions on my spine" and I had to do treatment of steroids, so - - I got behind

in school." (Dkt. 11-2, Pg ID 72- 75).  She explained further that she did well

with the classes in the beginning but "it all just went down hill" due to "stress, and

then I was more fatigued, my pains got worse and my muscles." *Id*. at Pg ID 75.

While plaintiff did intend to go to college, as she reported to Dr. Rossman in June

2011, the medical evidence documents a worsening of her condition during the

2011-2012 school year.  (Dkt. 11-7, Pg ID 287).  The medical evidence documents

that in April 2012, she complained of worsening chronic fatigue and recent MRI

findings showed "two subtle enhancing bilateral frontal lesions," and the possible

necessity of "changing her therapy to something that may be more aggressive than

Rebif" was addressed.  *Id*. at Pg ID 284.  During this visit, plaintiff was tearful and

apprehensive about the progression of her disease.  *Id*.  Plaintiff also maintains the

fact that the treatment received in September 2013 due to new lesions only lasted

three days does not negate the fact that her condition was again worsening, as

confirmed by the September 2013 MRI and optical tomography, discussed above.

8

(Dkt. 11-7, Pg ID 301-306, 314). The official transcript of the Wayne County Community College confirms that plaintiff was enrolled in an Introductory to Psychology course in the spring of 2012 and the fall of 2013, with the addition of an American Government course in the fall of 2013. (Dkt. 11-6, Pg ID 253). According to plaintiff, the fact that she was able to complete one class in the spring of 2012 and received a "B" grade, as noted by the ALJ, is not inconsistent with her claim that she cannot sustain work activity. *Id*.

Plaintiff next argues that the ALJ improperly accorded little weight to the opinion of plaintiff's treating physician, Dr. Rossman, that plaintiff met Listing 11.09. Plaintiff treated with the Michigan Institute for Neurological Disorders since June 25, 2009 and continuing through the date of the hearing. (Dkt. 11-7, Pg ID 282-298, 309-323). According to plaintiff, based on this extensive treatment history, spanning over five years, Dr. Rossman completed a questionnaire which, if credited, supports a finding that her MS meets the requirements of Listing 11.09.

In according "little weight" to Dr. Rossman's opinion, the ALJ claimed it "is not supported by the treatment records," again focusing on the normal neurological findings. However, as noted above, the symptoms of MS wax and wane, and Dr. Rossman diagnosed Ataxia based on plaintiff's history of balance and gait issues. (Dkt. 11-7, Pg ID 309-313). The support for plaintiff's falling

comes from her underlying MS as confirmed in multiple MRI scans.  Dr. Rossman also relied on reports from plaintiff and her mother of significant fatigue, gait, balance (with falls) and sensory and vision issues.  As noted above, some examinations found abnormal gait, sensory deficits and vision problems confirming these complaints.  Plaintiff points out that the preamble to the neurological listing of impairments specifically provides that persistent disorganization of motor function can be shown by ataxia and sensory disturbances "which occur singly or in various combinations" which "frequently provides the sole or partial basis" for the decision with neurological impairments. Listing 11.00(C).  Plaintiff maintains that the record confirms her sensory disturbances as evidenced by her visual impairment, confirmed by the optical tomography.  In turn, this evidence supports Dr. Rossman's opinion.

The ALJ further claimed that "Dr. Rossman's assessment does not appear to take into consideration Ms. Parker's "noncompliance with her medication, and the potential effect on her symptoms."  (Dkt. 11-2, Pg ID 59).  However, plaintiff points out that the questionnaire was completed on November 25, 2013, so Dr. Rossman was well aware that plaintiff had missed some doses of her medications as reported to him in September.  Plaintiff says that, Dr. Rossman was also (obviously) well aware that all Rebif can do is delay the "accumulation of physical disability," not cure the illness.

10

Next, plaintiff asserts that this matter should be remanded to obtain an updated medical opinion regarding equivalency.  In this case, given the lack of updated review by a medical expert of the key new objective evidence added to the record since the State agency medical consultant last reviewed this case in August 2012, plaintiff asserts that this Court should remand with instructions to obtain an updated opinion of medical equivalency.  The ALJ determined that plaintiff retains the residual functional capacity ("RFC") to perform sedentary work with some additional limitations.   However, plaintiff asserts that the record is absolutely devoid of any RFC or medical source statements from any medical providers, whether treating, consulting, or non-examining, which supports a sedentary work finding.  Moreover, given the fact that the State agency medical consultant who reviewed this case in August 2012 did not have the benefit of reviewing the key evidence from 2013 documenting a worsening of plaintiff's condition, plaintiff says the ALJ also erred in not obtaining an updated medical opinion regarding her functional limitations.  In this case, the ALJ recognized that the August 2012 medical opinion was outdated, as it "did not account for the claimant's September 2013 complaints of left lower extremity numbness and giving out, or her hearing testimony regarding her exertional limitations."  (Dkt. 11-2, Pg ID 59).  But since the record did not contain any other assessment of plaintiff's functional limitations, plaintiff contends that the ALJ took on the role of

medical expert and translated the raw medical data into functional limitations, which was improper.

Plaintiff also challenges the ALJ's Step 5 findings. Specifically, plaintiff says that the ALJ also failed to consider her urinary frequency and incontinence, which are hallmark symptoms of MS. Plaintiff testified that she needs to use the bathroom "maybe 8 to 10 times a day just back-to-back." (Dkt. 11-2, Pg ID 80). Thus, plaintiff says that she needs to take unscheduled breaks throughout the day to accommodate this need. The VE testified that if an individual requires breaks "outside the normal breaks and rest periods, it would erode the eight hour day because there would be no obligation by the employer to compensate for that time, and, therefore they couldn't work a competitive work week. There would be no jobs." *Id*. at Pg ID 85. Plaintiff also contends that ALJ failed to account for her credible testimony which is consistent with Dr. Rossman's opinion that her MS is work preclusive since it meets the requirements of Listing 11.09. Thus, plaintiff requests that the Court remand with instructions to award benefits.

C.    The Commissioner's Motion for Summary Judgment

According to the Commissioner, in evaluating the credibility of plaintiff's subjective complaints and alleged functional limitations, the ALJ appropriately accepted that plaintiff experienced some of her stated symptoms, but found that her allegations were not entirely credible. The Commissioner maintains that the

12

ALJ properly contrasted plaintiff's allegations of severely limiting multiple sclerosis-related symptoms with the record as a whole, which showed normal neurological examinations, noncompliance of prescribed treatment, gaps in treatment, toleration of medication without significant side effects, and ability to take college courses.  (Dkt. 11-2, Pg ID 57-58).  The Commissioner points out, contrary to plaintiff's arguments, that the ALJ expressly acknowledged the fact that MRIs of plaintiff's brain showed enhancing lesions but noted that neurological examinations were consistently normal nonetheless.  *Id*. at Pg ID 59.  The Commissioner urges the court to reject plaintiff's claim that waxing and waning explains plaintiff's largely normal neurological exams.  According to the Commissioner, while this phenomenon would possibly account for some discrepancy among neurological examinations (i.e., some abnormal findings followed by normal findings during a period of improvement), it does not explain the situation here, where neurological examinations were consistently normal.

As discussed by the ALJ, in June 2009, other than mild difficulty with tandem gait, the examination was normal.  (Dkt. 11-2, Pg ID 57; Dkt. 11-7, Pg ID 300).  Plaintiff's examination was again normal in September 2009.  (Dkt. 11-7, Pg ID 293).  In June 2010, plaintiff denied any new signs or symptoms.  *Id*. at Pg ID 291.  The examination in February 2011 showed slight nystagmus and gaze to the left but no diplopia (double vision).  *Id*. at Pg ID 299.  The examination in

June 2011 demonstrated stability from a neurological perspective.  *Id*. at Pg ID

288.  Plaintiff was deemed clinically asymptomatic at that time.  *Id*.  In June 2012,

plaintiff did not demonstrate any evidence of circumducting or dragging the left

leg, had a steady, unassisted gait, and was able to complete a tandem gait without

difficulty.  *Id*. at Pg ID 282-283.  Although pinprick was decreased on the left

from toe to groin in September 2013, light touch, hot and cold sensation, vibration,

and proprioception were normal, and Romberg was negative.  (Dkt. 11-7, Pg ID

315).  A few days later, plaintiff's neurological examination was normal.  *Id*. at Pg

ID 312.  According to the Commissioner, as found by the ALJ, the record

documents consistently normal neurological examinations.  While plaintiff points

to some discrete findings to demonstrate abnormalities – mainly an isolated

instance in June 2010 when it took her 12.47 seconds to walk twenty-five feet, and

the other isolated instances of mild difficulty with gait, antalgic gait, slight

nystagmus, and decreased sensation from toe to groin – the Commissioner

maintains that these few isolated instances of abnormal findings do not render

incorrect the ALJ's assessment that the record showed largely normal neurological

examinations.  Rather, the Commissioner asserts that it was reasonable for the ALJ

to note that, contrary to plaintiff's allegations of severe limitation, the objective

evidence of record did not demonstrate significant abnormality.

     Plaintiff next argues that the ALJ erred in discrediting her allegations based

on gaps in treatment, including missed appointments and failure to follow prescribed treatment. The Commissioner contends that it was permissible for the ALJ to find plaintiff's statements to be less credible since the level and frequency of her treatment was not consistent with the level of her complaints. The ALJ here pointed out that plaintiff not only had several large gaps in treatment, (i.e., from September 2009 to June 2010; June 2010 to February 2011; February 2011 to June 2011; June 2011 to April 2012; and June 2012 to September 2013), but also was noncompliant with prescribed medication. (Dkt. 11-2, Pg ID 59).

Plaintiff asserts "it appears that the record is missing some treatment notes as [she] testified that she sees Dr. Rossman every three to six months and last saw him in May 2013, a treatment note which is not in the record." (Pl. Br. at 15; Dkt. 11-2, Pg ID 41). The Commissioner points out, however, that it is plaintiff's burden to produce evidence of disability. If plaintiff or her attorney believed there were treatment notes missing from the record, they should have ascertained those records. The Commissioner maintains that there does not appear to be any reason why the ALJ should have gleaned that the record was missing treatment notes. As to plaintiff's assertion that the ALJ should have thought the record was incomplete since she stated at the December 2013 hearing that she last saw Dr. Rossman in May 2013 and the evidence contains no treatment record from that date, plaintiff's assertion is erroneous and not indicative of the record being incomplete. This is

15

so because the evidence in fact demonstrates that plaintiff treated with Dr.

Rossman in September 2013, indicating that, as of the December 2013 hearing,

plaintiff's last visit with Dr. Rossman was not in May 2013.  (Dkt. 11-7, Pg ID

309-313).

Plaintiff also implies that her medication noncompliance was due to

"insurance issues," further implying that the ALJ erred in considering such

noncompliance as part of his credibility evaluation.  (Pl. Br. at 15; see Dkt. 11-7,

Pg ID 283, 289).  According to the Commissioner, the records cited by plaintiff do

not state that she was unable to afford either health insurance or the medication;

they merely indicate that she was having "insurance related issues." *See id*.  The

ALJ made note of these "issues," thereby indicating that he considered them.

(Dkt. 11-2, Pg ID 57). Additionally, the medical record suggests that despite

Plaintiff's "insurance issues," there were still options for her to obtain treatment.

(*See* Dkt. 11-7, Pg ID 283: "Given her insurance, she will have to have

SoluMedrol treatments through the DMC Infusion Centers.").  Thus, even

assuming a lack of medical insurance contributed to plaintiff's gaps in treatment or

noncompliance with medication, the record does not evidence that she ever sought

any free or low-cost clinical treatment.  *See Riggins v. Apfel*, 177 F.3d 689, 693

(8th Cir.1999) ("Although Riggins claims he could not afford such medication,

there is no evidence to suggest that he sought any treatment offered to

16

indigents...).  Thus, even assuming plaintiff was unable to afford consistent treatment, the Commissioner says that it would not have been unreasonable for the ALJ to infer that there were treatment options available to plaintiff that she did not pursue.

What is more, even assuming plaintiff's financial status may have explained her failure to seek regular treatment, the Commissioner points out that the ALJ did not solely base his credibility finding on this lack of treatment, and, therefore, any purported error should be viewed as harmless.  *See Cowan v. Colvin*, 2014 WL 1338099, at *20 (N.D. Ala. 2014) (While poverty may excuse failure to follow prescribed medical treatment, "[i]f the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance [with treatment], the ALJ does not commit reversible error by failing to consider the claimant's financial situation.").  Plaintiff also appears to sidestep the treatment compliance issue by asserting that abnormal findings were documented during a time when she was noted to be compliant with medication.  (Pl. Br. at 16; see Dkt. 11-7, Pg ID 301-306, 313).  The Commissioner maintains that this fact alone has no bearing on the ALJ's correct assessment that plaintiff simply was not compliant with prescribed medication treatment and went many months at a time without seeking MS-related treatment, both of which demonstrate that her symptoms may not have been as severe as alleged and which were properly considered as part of the ALJ's

17

credibility evaluation.

Plaintiff also challenges the ALJ's finding that the record did not demonstrate any significant side effects from her medications.  (Pl. Br. at 16-17).  The ALJ noted that despite statements of flu-like symptoms from her MS medication contained in her Function Report, treatment records consistently noted that she tolerated the medication well, without flu-like symptoms.  (Dkt. 11-2, Pg ID 59; compare Dkt. 11-6, Pg ID 235; 11-7, Pg ID 285, 291, 292, 299).  According to the Commissioner, this is simply not a case where the treatment records "do not confirm" side effects of flu-like symptoms—rather, it is a case in which plaintiff's doctors specifically stated that plaintiff was "tolerating the medication well," without "significant flu-like side effects."  (*See e.g.*, Dkt. 11-7, Pg ID 286, 299).  Thus, not only does the record demonstrate that the ALJ properly evaluated the issue of medication side effects, it also supports a finding that plaintiff did not experience significant side effects.

Plaintiff finally challenges the ALJ's reliance on the fact that, despite allegations of severely disabling limitation, she was able to attend college and did not have to drop all of her classes because of "new lesions, and a course of steroid treatment."  (Pl. Br. at 17-18; see Dkt. 11-2, Pg ID 59).  According to the Commissioner, the ALJ correctly noted that although plaintiff indicated that she had to drop out of college in 2011 due to lesions, the record showed that despite

18

the discovery of new lesions in June 2011, she reported at that same treatment visit that she was planning to attend college.  (Dkt. 11-7, Pg ID 287).  What is more, the record does not show any treatment again until  February 2012.  Thus, the Commissioner says it was reasonable for the ALJ to infer that it was not treatment for these lesions that prevented Plaintiff from attending college in Fall 2011. Plaintiff also alleged that she had to drop her courses again in 2013, due in part to steroid treatment. However, the record shows that the treatment at issue during that time only lasted for three days.  (Dkt. 11-2, Pg ID 59; see Dkt. 11-7, Pg ID 309-316).  The Commissioner contends that even if the ALJ erred in questioning the reasons plaintiff provided for having to drop her college courses, the ALJ's focus on plaintiff's college course-load was to contrast her allegations of severe limitation with her ability to attend and complete college courses.

Next, the Commissioner asserts that the ALJ properly concluded that plaintiff did not meet the Listing for MS and appropriately gave little weight to Dr. Rossman's opinion.  On November 25, 2013, Dr. Rossman completed a questionnaire indicating that plaintiff's MS was consistent with the "A" and "C" criteria of Listing 11.09.  (Dkt. 11-7, Pg ID 307-308); see 20 C.F.R. Pt 404, Subpt. P, App. 1, Listing 11.09 ("A"- significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements; "C"- significant, reproducible fatigue of motor function,

19

with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved in the Multiple Sclerosis process).  The ALJ considered Dr. Rossman's opinion that plaintiff's MS satisfied the A2 and C criteria of Listing 11.09, but accorded it little weight because it was "not supported by the treatment records."  (Dkt. 11-2, Pg ID 58).  The ALJ explained that although plaintiff complained of left lower dragging and balance issues in June 2012, her gait was steady and normal; although she complained of left leg numbness and "giving out" in September 2013, her neurological and musculoskeletal examinations were normal; September 2012 examinations did not significantly reflect the left lower extremity numbness she alleged; despite allegations of general fatigue in April and June 2012, the record does not reflect the level of motor fatigue and weakness necessitated by the Listing.  (Dkt. 11-2, Pg ID 59).  According to the Commissioner, the ALJ's detailed discussion of Dr. Rossman's opinion and why it was not supported by the treatment records amounted to "good reasons" for not according the opinion controlling weight, and, indeed, for giving the opinion only "little weight."

While plaintiff challenges the ALJ's reasoning, asserting that the symptoms of MS can wax and wane and, implying that it was inappropriate for him to focus on normal neurological findings to contrast Dr. Rossman's opinion, the

20

Commissioner contends that Listing 11.09 emphasizes sustained and persistent limitation. *See* 20 C.F.R. Pt 404, Subpt. P, App. 1, sections 11.00, 11.09. According to the Commissioner, the Listing itself contemplates the "waxing and waning" nature of MS and nonetheless requires evidence of sustained and persistent impairment. As discussed at length by the ALJ, the record, which shows overall consistently normal gait, normal neurological and musculoskeletal examination, mild numbness, and isolated general fatigue, simply does not support a finding of persistent or sustained disorganization or fatigue of motor function required to meet Listing 11.09. As such, the Commissioner says that the ALJ reasonably accorded little weight to Dr. Rossman's opinion that plaintiff's MS satisfied the requirements of the Listing.

The Commissioner also maintains that the ALJ appropriately considered the fact that it appeared as though Dr. Rossman's assessment did not account for plaintiff's noncompliance with her medication, and the potential effect on her symptoms. (Dkt. 11-2, Pg ID 59). Plaintiff responds that Dr. Rossman "was well aware that [she] had missed some doses of her medications" since she reported such to him in September. (Pl. Br. at 22; see Dkt. 11-7, Pg ID 307-308). According to the Commissioner, even assuming Dr. Rossman was aware of the medication noncompliance issue, that fact would not negate the ALJ's determination that, whether plaintiff was compliant or noncompliant, the record

21

simply does not demonstrate findings consistent with Listing 11.09.

Plaintiff further argues that remand for an updated medical opinion is necessary because State agency physicians Weintraub's and Fisher's[1] opinions that plaintiff's impairments were not equivalent in severity to any Listed impairment were issued in August 2012, before Dr. Rossman's opinion that her MS satisfied Listing 11.09. (Pl. Br. at 23; see Dkt. 11-3, Pg ID 107-124). Plaintiff asserts that Dr. Rossman's opinion constitutes new objective evidence that warrants an updated medical judgment per SSR 96-6p. However, the Commissioner asserts that since Dr. Rossman's opinion that plaintiff's impairments satisfied Listing 11.09 is not supported by the evidence of record, the bulk of which predates August 2012, the date the State agency physicians issued their opinions, Dr. Rossman's opinion would not change the outcome of Dr. Weintraub's and Dr. Fisher's opinions. *See* SSR 96-6p (updated medical expert opinion required when, in the opinion of the ALJ, the additional evidence may change the finding of the State agency medical consultant that the claimant's impairments are not equivalent in severity to the Listings). Thus, contrary to plaintiff's assertion, the Commissioner asserts that the issuance of Dr. Rossman's opinion does not warrant an updated medical expert opinion regarding the issue of medical equivalence.

---

[1] There is nothing in the record suggesting that Courtney Fisher is a physician. Rather, she appears to be a disability examiner. The ALJ does not appear to have relied on her "opinions," in any event.

The Commissioner also urges the Court to reject plaintiff's argument that the RFC is not supported by substantial evidence because "the record is absolutely devoid of any RFC or medical source statements from any medical providers, whether treating, consulting, or non-examining, which supports a sedentary work finding." (Pl.'s Br. at 23). The Commissioner points out that a claimant's residual functional capacity is an administrative finding as to the most she can do despite her limitations and here, the ALJ considered all of the objective and subjective evidence of record and reasonably concluded that it supported a finding that plaintiff could perform a reduced range of sedentary work. (Dkt. 11-2, Pg ID 55-59). In arriving at this determination, the ALJ noted that he accorded some weight to Dr. Weintraub's opinion that plaintiff could perform light work. (Dkt. 11-2, Pg ID 59). However, the ALJ found that Dr. Weintraub's opinion did not sufficiently account for the allegations plaintiff made subsequent to the issuance of the opinion--namely, complaints of left lower extremity numbness and giving out, and her hearing testimony regarding her exertional limitations. (Dkt. 11-2, Pg ID 59). The Commissioner maintains that in finding plaintiff to have an RFC that was more limited than Dr. Weintraub opined, the ALJ did not impermissibly play the "role of medical expert," translating "the raw medical data into functional limitations[.]" (See Pl. Br. at 25; 26-28). Rather, the ALJ properly considered the entirety of the objective and subjective evidence of record and determined that it

23

supported an RFC finding of a more limited version of Dr. Weintraub's opinion. To be sure, the RFC finding is to be based on "all relevant evidence, not only medical opinions." 20 C.F.R. §§ 404.1545(a), 404.1546, 416.945(a), 416.946. As such, the ALJ must evaluate all of the evidence of record in order to complete the administrative task of assessing an RFC. *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."). According to the Commissioner, that is precisely what the ALJ here did, and his RFC is squarely supported by the record as a whole.

The Commissioner next asserts that plaintiff's Step 5 argument is without merit because the ALJ's hypothetical to the VE mirrored his RFC determination, (compare Dkt. 11-2, Pg ID 55, 82-83), which is supported by substantial evidence. "A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). According to the Commissioner, aside from vague assertions that the hypothetical was based on an inadequate RFC, the only specific limitations plaintiff asserts were omitted from the hypothetical posed to the VE were regarding bathroom breaks (see Pl. Br.

24

at 29). The Commissioner contends, however, that aside from her own bare allegation of needing to use the bathroom eight to ten times per day, plaintiff does not point to any medical documentation of such limitation, or any medical opinion demonstrating that plaintiff required unscheduled breaks throughout the day to accommodate such bathroom trips. As such, the Commissioner asserts that ALJ did not need to incorporate the limitation into his questioning to the vocational expert. Thus, according to the Commissioner, since the ALJ's RFC for a range of sedentary work was supported by substantial evidence of record, the VE's response to the ALJ's hypothetical constituted substantial evidence on which the ALJ could reasonably rely at Step Five.

## III. DISCUSSION

### A.   Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case

de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing *Mullen*, 800 F.2d at 545.

26

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

27

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

C.   Analysis

1.   Listing

At Step Three, a claimant meeting or medically equaling "the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411, 414

28

(6th Cir. 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "Listing of

Impairments, located at Appendix 1 to Subpart P of the regulations, describes

impairments the SSA considers to be 'severe enough to prevent an individual from

doing any gainful activity, regardless of his or her age, education, or work

experience.'" *Id*. (citing 20 C.F.R. § 404.1525(a)). A finding of disability under

Listing 11.09A requires a diagnosis of MS with: "Disorganization of motor

function," § 11.09A, characterized by "[s]ignificant and persistent disorganization

of motor function in two extremities, resulting in sustained disturbance of gross

and dexterous movements, or gait and station." § 11.04B.[2] Listing 11.00C states

that "persistent disorganization of motor function" may take the form of "paresis

or paralysis, tremor or other involuntary movements, ataxia and sensory

disturbances ..." *Id*. Listing 11.09C states further that the motor function

limitations "frequently provides the sole or partial basis for decision in cases of

neurological impairment," noting that the "assessment of impairment depends on

the degree of interference with locomotion and/or interference with the use of

fingers, hands, and arms."

    At Step 3, the ALJ made the following findings:

> The claimant's condition does not meet listing 11.09,
> Multiple Sclerosis, because the record does not provide

---

[2] Listing 11.09B does not appear to be at issue because Dr. Rossman did not opine that plaintiff met this Listing. (Dkt. 11-7, Pg ID 397-398).

evidence of disorganization of motor function, visual or mental impairment as described under sections related to senses or mental impairment. Nor does the record reflect significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity.

(Dkt. 11-2, Pg ID 55).  Later in his decision, the ALJ also explained why he

rejected Dr. Rossman's opinion that plaintiff satisfied the Listing:

Dr. Rossman completed a medical source statement in November 2013 (Exhibit 3F). The statement consisted of a copy of listing 11.09, Multiple Sclerosis, and directions to circle the criteria that were satisfied. Dr. Rossman stated that the claimant had the defined significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements (section A2). He also circled part C of the listing: significant, reproducible fatigue of motor function, with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved in the multiple sclerosis process. Dr. Rossman stated that the claimant met "A2, BC," but he did not circle any B criteria.

Little weight is given to Dr. Rossman's opinion that the claimant meets listing 11.09. Although he is a treating source, this assessment is not supported by the treatment records. The claimant complained of left lower dragging and balance issues in June 2012, but her gait was steady and normal (Exhibit IF, p.3). She complained of left leg numbness and "giving out" in September 2013, but her neurological and musculoskeletal exams were normal (Exhibit 4F).  Her September 2012 complaints of left lower extremity numbness were deemed mild because the exam did not significantly reflect the numbness alleged (Exhibit SF). The claimant complained of

30

> general fatigue in April and June 2012, but the record
> does not reflect the level of motor fatigue and weakness
> described in section C of the listing. Further, Dr.
> Rossman's assessment does not appear to take into
> consideration the claimant's noncompliance with her
> medication, and the potential effect on her symptoms.

(Dkt. 11-2, Pg ID 58-59).

In the view of the undersigned, the ALJ's decision to give Dr. Rossman's

opinion reduced weight is supported by substantial evidence. The present

circumstances are very similar to those assessed in *Dean v. Comissioner of Soc.*

*Sec.*, 2016 WL 878331, at *2 (E.D. Mich. 2016) (Michelson, J.). In *Dean*, the

Court was also assessing a "multiple choice" form such as the one Dr. Rossman

completed. *Dean* pointed out that , "[C]ourts have increasingly questioned the

evidentiary value of 'multiple choice' opinion forms ... which are not supported by

clinical records." *Id*. (quoting *Lane v. Comm'r of Soc. Sec.*, 2013 WL 5428739, at

*9 (W.D. Mich. 2013) (report and recommendation finding no err in ALJ

discounting multiple choice opinion form that was unsupported by evidence or

explanation). As in *Dean*, the ALJ here reasonably concluded that there was not

sufficient evidence in Dr. Rossman's treatment records to support "his

checked-box opinion that [the plaintiff] meets listing § 11.09C." *Id*. In *Dean*, the

only explanation provided by the treating physician was a note under the box that

he checked, which read, "Excessive fatigue which is not uncommon [with] MS."

31

*Id*. In *Dean*, Judge Michelson observed that nothing from the prior medical records suggested any physical examination that touched on the elements of § 11.09C "demonstrat[ing]" "reproducible fatigue of motor function with substantial muscle weakness on repetitive activity." While fatigue is mentioned by Dr. Rossman at some of plaintiff's examinations, there is no suggestion of "reproducible fatigue" or that he "physically examined the fatigue effects of repetitive activity." *See Dean*, at *2. Similarly, Dr. Rossman's records do not demonstrate a "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross dexterous movements." While plaintiff is correct that the symptoms of MS can wax and wane, the Listing still requires "significant and persistent disorganization of motor function" or "significant, reproducible fatigue of motor function," which are not evidenced from this record. *See* Listing 11.09A and 11.09C. Because Dr. Rossman's opinion, just as that examined in *Dean*, "was conclusory and unsupported by his prior treatment notes, the ALJ was free to discount it." *Id*. (citing *Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding Price's impairments, the ALJ did not err in discounting his opinion."); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (providing that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs

and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion").

2.      Medical Opinion on Equivalence and RFC

Notwithstanding, given that the medical opinion in the record from Dr. Weintraub on equivalence is dated August 17, 2012 (Dkt. 11-3, Pg ID 107-115), well before Dr. Rossman's 2013 examination, MRI, and vision testing, the undersigned concludes that an updated opinion on equivalence must be obtained on remand.  While the ALJ reserves the right to decide certain issues, such as a claimant's RFC, 20 C.F.R. § 404.1527(d), courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data.  *See Isaacs v. Astrue*, 2009 WL 3672060, at *10 (S.D. Ohio 2009) ("The residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'") (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical

33

opinion supported the [RFC] determination."); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").  As the *Deskin* court explained:

> An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the "medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) ... [the Commissioner may not] make the connection himself."

*Deskin*, 605 F.Supp.2d at 912 (quoting *Rohrberg v. Apfel*, 26 F.Supp.2d 303, 311 (D. Mass. 1998) (internal citation omitted).  "Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test." *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866 at *2 (N.D. Ohio 2011).  Rather, *Deskin* potentially applies in only two circumstances: (1) where an ALJ made an RFC determination based on no medical source opinion; or (2) where an ALJ made an RFC determination based on an outdated source opinion that did not include consideration of a critical body of objective medical evidence.  *Id.*  In this case, the medical opinion regarding equivalence is outdated, based on the most recent

34

examination and objective testing performed by Dr. Rossman. Thus, the undersigned concludes that this matter should be remanded so that the ALJ can obtain an updated opinion of a medical advisor on the issue of equivalency and plaintiff's RFC.

Given the above conclusions, the ALJ will have to re-assess plaintiff's credibility and additional vocational expert testimony may be required, depending on the conclusions the ALJ reaches on remand regarding plaintiff's RFC. In particular, the Court is concerned that plaintiff's visual disturbances were not specifically addressed in the hypothetical question. The hypothetical question posed to the vocational expert must accurately portray all of claimant's physical and mental limitations. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (citing *Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp. 2d 489, 497 (E.D. Mich. 2005)). Yet, in fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Id*. (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). An ALJ is not required to accept a claimant's subjective complaints, and can present a hypothetical to the VE on the basis of his own reasonable assessment of the testimony and other evidence. *Id*. (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)). While not raised to any great extent in the briefing, it is of particular note that although (1) plaintiff's medical records

over the course of 2012 and 2013 contain multiple references to visual disturbances by the plaintiff, including one episode in 2013 that appears to have lasted for a month, (2) plaintiff testified that she suffered from both blurry and double vision which prompted her to forego obtaining a driver's license, and (3) she was diagnosed with optic neuritis attendant to her MS, the ALJ's hypothetical posed to the VE did not incorporate any limitation related to episodes of impaired vision.   (Dkt. 11-7, Pg ID 282, 309, 314; Dkt. 11-7, Pg ID 75-77).   Thus, plaintiff's visual disturbances appear to be based on far more than her subjective complaints alone.   On remand, the undersigned suggests that the medical advisor address the effect of plaintiff's recurring visual impairment on her ability to perform substantial gainful activity, so that the ALJ can pose a hypothetical to the vocational expert that fully accounts for any visual impairment found to be credible.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be **REVERSED AND REMANDED** for proceedings consistent with this Report and Recommendation.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 17, 2016                    s/Stephanie Dawkins Davis
                                         Stephanie Dawkins Davis
                                         United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on August 17, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                         s/Tammy Hallwood
                                         Case Manager
                                         (810) 341-7887
                                         tammy_hallwood@mied.uscourts.gov